IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WASHINGTON ENERGY CO., LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-1451 |
| v. | ) | |
| | ) | Chief Judge Donetta W. Ambrose |
| CENTURY SURETY COMPANY, | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| Defendant. | ) | Doc. Nos. 13, 14 |

## REPORT AND RECOMMENDATION

### I.    RECOMMENDATION

It is recommended that Plaintiff's Motion for Summary Judgment (Doc. No. 13) be

granted, Defendant's Motion for Summary Judgment (Doc. No. 14) be denied, and that Judgment

be entered in favor of Plaintiff.

### II.  REPORT

Presently before the Court for disposition are cross motions for summary judgment.

Plaintiff, Washington Energy Company, LLC (hereinafter "Washington Energy" or the

"Insured"), instituted this declaratory judgment action on September 21, 2004, against Defendant,

Century Surety Company (hereinafter "Century" or "Defendant"), seeking a declaration as to the

rights and obligations of the parties regarding coverage under a commercial general liability policy.

In its Complaint, Washington Energy asserted three claims against Century: Declaratory judgment

(Count I); breach of contract (Count II); and bad faith (Count III).  Subsequently, the parties

stipulated that Count III was withdrawn and Judge Ambrose entered an order dismissing Count III

with prejudice on January 21, 2005.  (Doc. No. 11.)  Likewise, Washington Energy withdrew its

claims for lost revenue and additional extra-contractual liability (including its claims for expenses, penalty interest, punitive damages, court costs, pre-judgment and post-judgment interest, attorney's fees, and other consequential damages), which were also dismissed with prejudice by Judge Ambrose. *Id.* Thus, the only remaining claims at issue in the cross motions for summary judgment are Washington Energy's declaratory judgment and breach of contract claims.

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332. Venue in this District is proper under 28 U.S.C. § 1391.

The issue presented here is whether two business risk exclusions, specifically, the impaired property exclusion and sistership (or product recall) exclusion, apply to bar coverage under a general commercial liability insurance policy issued by Century, thereby negating Century's duty to indemnify Washington Energy for losses incurred by customers of Washington Energy when the natural gas it was supplying to these customers became contaminated. For the reasons set forth below and because it appears that no material issues of fact exist and that Washington Energy is entitled to judgment as a matter of law, the Court recommends that Plaintiff's Motion for Summary Judgment be granted, and Defendant's Motion for Summary Judgment be denied.

## A.    Facts and Procedural History

The relevant facts have been stipulated to by the parties.[1] At all relevant times, Washington Energy supplied natural gas to Columbia Gas of Pennsylvania (hereinafter "Columbia"). (Jt. Stip. ¶ 1.) On March 10, 2004, a part of Washington Energy's mechanical equipment used to transmit natural gas, the metal nipple part of a compressor, ruptured without warning. (Jt. Stip. ¶ 2.) As a

---

[1]The stipulated facts are set forth in the Joint Stipulation of Facts (Doc. No. 12); citations thereto shall take the form: "Jt. Stip. ¶ __."

result of the rupture, air infiltrated Washington Energy's natural gas transmission line, as well as Columbia's main transmission line (hereinafter the "Columbia Line"), which was connected to Washington Energy's line, and the service lines of approximately 1,400 Columbia customers. (*Id.*)

As a result of the equipment failure, Columbia suffered a complete loss of use of the Columbia Line due to the dangerous condition created by the air that infiltrated the Columbia Line, which required Columbia to cease using the Columbia Line and take action to restore the line to use, including flushing the Columbia Line and the lines of approximately 1,400 individual customers of Columbia over a period of several days. (Jt. Stip. ¶¶ 3-5.) The total cost of the labor and other expenses incurred by Columbia to restore the Columbia Line to use was $ 128,033.36 (hereinafter the "Columbia Loss"). (Jt. Stip. ¶¶ 7, 10.) Columbia submitted a claim to Washington Energy for the Columbia Loss and requested full payment from Washington Energy as a condition precedent to reconnecting to Washington Energy's line and resuming business with Washington Energy. (Jt. Stip. ¶ 8.)

Thereafter, Washington Energy submitted the Columbia Loss to Century under the insurance policy for payment.[2] On May 27, 2004, Century issued a reservation of rights letter to Washington Energy, indicating that based on the information provided to date, it concluded that the Columbia Loss did not arise from "property damage" as defined in the policy. (Jt. Stip. ¶ 35 and Ex. J and K attached thereto.) Century further indicated in the reservation of rights letter that the exclusions for failure to complete your work and for failure to adequately supply gas may preclude coverage under the Policy. (Ex. J. attached to Jt. Stip.)

---

[2]Washington Energy appears to have provided timely and proper notice of the claim to Century's authorized representative. (Jt. Stip. ¶¶ 27-28.)

Century then retained an expert, Robert Bogan, to inspect the nipple and "determine the cause of [the nipple's] failure." (Jt. Stip. ¶ 29.) Mr. Bogan issued a report on June 15, 2004, wherein he noted his observations regarding the cause of Washington Energy's equipment failure:

> Initial visual examination of the nipple showed it failed by cracking through its threads at or near where the threads exited the attached fitting. The crack started on the inside of the nipple . . . Detailed examination . . . showed a small area where the crack appeared to start, followed by fatigue growth of the crack, from the inside, around approximately half of the circumference of the nipple. After the crack had grown this large, the nipple was sufficiently weakened for rapid catastrophic failure to occur, as evidenced by the ruptured appearance of the other half of the fractured surface. Examination of the nipple under a light microscope revealed a crack that started on the inside surface of the nipple in the "small area" discussed above. The discovery of this crack verifies the above discussion of the failure mode; i.e., fatigue growth of an initial crack, geometric weakening of the nipple, followed by rapid catastrophic failure . . . Determination of the root cause of the initial crack would require destructive testing . . . This examination may reveal what caused the crack to start; corrosion or a manufacturing defect or perhaps a combination of both.

(Jt. Stip. ¶ 32 (quoting Ex. H attached thereto).)     Within the bounds of reasonable scientific certainty, Mr. Bogan opined:

> 1. The nipple in question failed by fatigue growth of an initial crack on the inside wall, the resultant geometric weakening of the nipple, followed by rapid catastrophic failure.
> 2. The root cause of the initial crack is either corrosion or a manufacturing defect in the nipple. Destructive SEM examination may be able to determine this root cause.
> 3. The pumping station equipment was in good working order and did not contribute to the nipple's failure.
> 4. The crack started internally and there was no reasonable way to detect the problem before the final rapid failure.

(Jt. Stip. ¶ 33 (quoting Ex. H at 2).)

On July 2, 2004, after receiving additional information regarding Columbia's claims, Century

4

issued a Supplemental Reservation of Rights letter, indicating that exclusions k, l, and n in the Commercial General Liability Coverage Form, and certain Definitions contained therein, may preclude coverage.  (Jt. Stip. ¶ 35 and Ex. L attached thereto.)  On that same date, counsel for Washington Energy sent a letter to Century, outlining Washington Energy's position that the resulting "property damage" claimed is the loss of use of Columbia's transmission lines.  (Ex. M attached to Jt. Stip.)

On July 9, 2004, Century issued another letter to Washington Energy outlining its understanding of the events leading up to the claim, the ongoing investigation, and Century's view of the coverage issues presented.  (Jt. Stip. ¶ 35 and Ex. M attached thereto.)  Century indicated in this correspondence that its coverage analysis was based on the premise that the alleged "property damage" was to the gas supplied to Columbia by Washington Energy, and that the costs incurred by Columbia were remediation costs associated with the gas/air mixture that entered Columbia's lines. (Ex. M attached to Jt. Stip.)  According to Century, under its analysis of the nature of the "property damage," coverage was precluded by exclusions k, l, and n; under Washington Energy's analysis of the nature of the "property damage," *i.e.,* loss of use damages, coverage was precluded by another exclusion, *i.e.,* exclusion m – "Damage To Impaired Property Or Property Not Physically Injured." (*Id.*)

On July 13, 2004, counsel for Washington Energy responded to the previous correspondence from Century, expressing its dissatisfaction with Century's indecision on coverage for the claim, as well as its failure to respond to Washington Energy's prior requests for Century's consent to allow Washington Energy to settle the Columbia claim with its own funds and without prejudice to Washington Energy's coverage claim.  (Ex. C to Pl.'s Br. in Supp. of Mot. for Summ. J. (Doc. No.

15).)  Two days later, on July 15, 2004, Century issued a letter to Washington Energy reiterating its position that there was no coverage for Washington Energy's claim under the Policy, as previously set forth in its July correspondence.  (Jt. Stip. ¶ 36 and Ex. N attached thereto.)   Century further advised Washington Energy that it was taking no position  regarding Washington Energy's intent to settle the Columbia Loss out of funds not recoverable under the Policy.  (Ex. N attached to Jt. Stip.)  On July 29, 2004, Century clarified its position regarding Washington Energy's request for consent to settle the Columbia Loss, indicating that permission to settle was not necessary because it was denying coverage; however, Century informed Washington Energy it would not raise the "consent to settle" clause as a defense in any ensuing arbitration or litigation.  (Ex. D to Pl.'s Br. in Supp. of Summ. J. (Doc. No. 15).)

On August 5, 2004, Washington Energy paid Columbia the amount of the Columbia Loss in full satisfaction of all claims relating to the May 10, 2004 equipment failure.  (Jt. Stip. ¶ 17 and Ex. E attached thereto.)  Subsequently, Vinsick Foods, Inc. (hereinafter "Vinsick"), a natural gas customer of Columbia's, submitted a claim to Washington Energy in the amount of $ 3,000.00 for the loss of use of its business during the time the Columbia Line was out of service (hereinafter "Vinsick Loss").  (Jt. Stip. ¶ 18.)  On August 28, 2004, Washington Energy paid Vinsick $ 1,500.00 in full satisfaction of its claim.  (Jt. Stip. ¶ 19.)

Washington Energy then instituted the instant declaratory judgment and breach of contract action on September 21, 2004 against Century to obtain a declaration of its right to coverage under the Policy and to recoup the amount of the money damages it paid to Columbia and Vinsick in satisfaction of their claims.

B.      **The Insurance Policy**

At all relevant times, Washington Energy was an insured under a commercial general liability policy issued by Century, Policy No. CCP285828, which was in effect from December 1, 2003 to December 1, 2004 (the "Policy").  (Jt. Stip. ¶ 20.)  The Policy provides $1,000,000.00 of insurance coverage.  (Jt. Stip. ¶ 22.)  The relevant provisions of the Policy are set forth below.

<u>Insuring Agreement</u>

The Policy Insurance Agreement states that Century:

> will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Jt. Stip. ¶ 23 and Ex. F thereto (*Commercial General Liability Coverage Form* at 1).)

<u>Exclusions</u>[3]

The Policy contains the following relevant exclusions:

> This insurance does not apply to:
>
> \* \* \*
>
> m.      **Damage To Impaired Property Or Property Not Physically Injured**
>
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1)      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work";

---

[3]Although the reservation of rights letters issued by Century indicated that exclusions k, l, m and n applied to preclude coverage, Century's argument on summary judgment is based upon only exclusions m and n.

or

(2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n.     Recall Of Products, Work Or Impaired Property**[4]

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1)     "Your product";
(2)     "Your work"; or
(3)     "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Jt. Stip. ¶¶ 24 and Ex. F thereto (*Commercial General Liability Coverage Form* at 5).)  In addition,

an Endorsement to the Policy sets forth an **Exclusion for Failure to Supply**, which provides:

This insurance does not apply to "bodily injury" or "property damage" arising out of the failure of any insured to adequately supply gas, oil, water, electricity or steam.

This exclusion does not apply if the failure to supply results from the sudden and accidental injury to tangible property owned or used by any insured to procure, produce, process or transmit the gas, oil,

---

[4]This exclusion is commonly referred to as the "sistership" exclusion, based on the practice in the aircraft industry of recalling planes for repairs when a plane of the same model had crashed because of a design defect.  9 *Couch on Insurance* § 130:12 (3d ed. 2005) (citation omitted); *see also Keystone Filler & Mfg. Co., Inc. v. American Mining Ins. Co.,* 179 F.Supp.2d 432, 439 (M.D.Pa. 2002).

8

water, electricity or steam.

(Ex. F to Jt. Stip. (*Exclusion - Failure to Supply Endorsement* at 1).)

<u>Definitions</u>

The Policy provides the following pertinent definitions:

* * *

8.      "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less usefull because:

      a.      It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

      b.      You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

      a.      The repair, replacement, adjustment or removal of "your product" or "your work"; or

      b.      Your fulfilling the terms of the contract or agreement.

* * *

13.      "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

17.      "Property damage" means:

      a.      Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

9

or

b.     Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

* * *

For the purposes of this insurance, "property damage" is not physical injury to tangible property, any resultant loss of use of tangible property, nor loss of use of tangible property that is not physically injured that arises out of failure to complete or abandonment of "your work".

21.    "Your product":

a.     Means:

(1)    Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a)    You;
(b)    Others trading under your name; or
(c)    A person or organization whose business or assets you have acquired; and

(2)    Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or

10

products.

b.   Includes

(1)   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or sue of "your product"; and

(2)   The providing of or failure to provide warnings or instructions.

c.   Does not include vending machines or other property rented to or located for the use of others but not sold.

22.   "Your work":

a.   Means:

(1)   Work or operations performed by you or on your behalf; and

(2)   Materials, parts or equipment furnished in connection with such work or operations.

b.   Includes

(1)   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2)   The providing of or failure to provide warnings or instructions.

(Jt. Stip. ¶ 25 and Ex. F thereto (*Commercial General Liability Coverage Form* at 13-16; *Oil and*

*Gas Amendatory Endorsement* at 6).)

### C.    Standard of Review

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

More specifically, the moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### D.    Discussion

Washington Energy has moved for summary judgment asking this Court to find as a matter of law that Century has a duty to indemnify it under the Policy for the damages incurred by Columbia and Vinsick. In support of this argument, Washington Energy submits that the Columbia and Vinsick Losses constitute "property damage" and that such "property damage" resulted from an

"occurrence", as those terms are defined in the Policy.  Accordingly,  Washington Energy argues coverage exists under the Policy, unless Century proves that one of the exclusions applies. Washington Energy submits that Century has failed to show that either of the business risk exclusions (*i.e.,* impaired property and sistership exclusions) on which it based its denial of coverage applies in this case to bar coverage. Washington Energy argues that conceptually, the losses incurred here are not the type of losses that the business risk exclusions are intended to address, as the damages here clearly were not within Washington Energy's control.   In the event that the impaired property exclusion is found to apply, Washington Energy contends that it has shown that the exception to the exclusion applies, *i.e.,* the Columbia and Vinsick Losses arose out of a sudden and accidental physical injury to Washington Energy's product or work after it had been put to its intended use, and, therefore, coverage is not barred.  At the very least, Washington Energy argues, the language of the exclusions is ambiguous and should be construed in its favor.

Century has cross-moved for summary judgment asking this Court to find as a matter of law that no coverage exists under the Policy and therefore, it owes no duty to Washington Energy to indemnify it for the Columbia and Vinsick Losses.  In support of this argument, Century contends that both the impaired property exclusion and sistership exclusion apply to bar coverage, maintaining that the resulting losses were within Washington Energy's control.  Century disputes that the exception to the impaired property exclusion applies, arguing that there was no  physical injury to Washington Energy's product (*i.e.,* the natural gas) and that the air infiltrated the natural gas before it had been put to its intended use.  In advancing its argument, Century no longer appears to be

13

disputing that the losses incurred by Columbia and Vinsick constitute "property damage"[5] or that this "property damage" was caused by an "occurrence," as those terms are defined under the Policy. Finally, Century submits that the applicable Policy exclusions are clear and unambiguous and the Court must give effect to that language.

Each of these arguments is addressed below *in seriatim.*

### 1.     Interpreting Insurance Contracts Under Pennsylvania Law

A federal court exercising diversity jurisdiction is required to apply the substantive law of the state in which it sits. *Covington v. Continental Tire, Inc.,* 381 F.3d 216, 218 (3d Cir. 2004); *Highlands Ins. Co. v. Hobbs Group, LLC,* 373 F.3d 347, 351 (3d Cir. 2004) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938)).   In this case, it is undisputed that Pennsylvania law governs the legal issues presented.

Resolution of the pending cross motions for summary judgment turns upon the proper interpretation of the Policy.   In Pennsylvania, the law regarding the interpretation of an insurance contract is well established.  Generally, the task of interpreting an insurance contract is for the court rather than the jury. *Standard Venetian Blind Co. v. American Empire Ins. Co.,* 469 A.2d 563, 566 (Pa. 1983).  The Supreme Court in *Standard Venetian* opined on this task as follows:

> The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.  Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.  Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

---

[5]Century contends there was no physical injury to Columbia's or Vinsick's tangible property, but rather, these losses qualify as "property damage" based on the second part of the definition, *i.e.,* "loss of use of tangible property that is not physically injured."

*Id.*   In *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* the Pennsylvania Supreme Court

explained when a contract provision would be deemed ambiguous:

> Contractual language is ambiguous "if it is reasonably susceptible of
> different constructions and capable of being understood in more than
> one sense. *Hutchison v. Sunbeam Coal Co.,* 513 Pa. 192, 201, 519
> A.2d 385, 390 (1986). This is not a question to be resolved in a
> vacuum. Rather, contractual terms are ambiguous if they are subject
> to more than one interpretation when applied to a particular set of
> facts. *See Gamble Farm,* 440 Pa.Super. at 505, 656 A.2d at 144;
> *Techallory,* 338 Pa.Super. at 7, 487 A.2d at 823. We will not,
> however, distort the meaning of the language or resort to a strained
> contrivance in order to find an ambiguity. *Steuart v. McChesney,* 498
> Pa. 45, 53, 444 A.2d 659, 663 (1982).

557 Pa. 595, 606, 735 A.2d 100, 106 (1999).

An obligation to indemnify arises only if it is established that the insured's damages are

actually within the coverage provided in the policy. *Lucker Mfg., Inc. v. Home Ins. Co.,* 23 F.3d 808,

821 (3d Cir. 1994) (citation omitted); *Winner Int'l Corp. v. Continental Cas. Co.,* 889 F.Supp. 809,

816 (W.D.Pa. 1994) (citing *Allstate Ins. Co. v. Brown,* 834 F.Supp. 854, 857 (E.D.Pa. 1993)). An

inquiry into whether a particular loss is covered by the policy depends upon the type of claim in issue

and thus, involves a question of law. *Creed v. Allstate Ins. Co.,* 365 Pa.Super. 136, 140, 529 A.2d

10, 12 (1987) (citations omitted). Where an insurer relies on an exclusion in the policy as the basis

for its denial of coverage, the insurer bears the burden of proving the application of such exclusion.

*Madison Constr. Co.,* 557 Pa. at 605, 735 A.2d at 106 (citations omitted).

Where the insurance policy does not define terms in question, words of common usage in the

policy are to be construed in the natural, plain, and ordinary sense, and the Court may inform its

understanding of those terms by considering their dictionary definitions. *Madison Constr. Co.,* 557

Pa. at 608, 735 A.2d at 108 (citing *Easton v. Washington Energy County Ins. Co.,* 391 Pa. 28, 33,

15

137 A.2d 332, 335 (1957); *Blue Anchor Overall Co. v. Pa. Lumbermens Mut. Ins. Co.,* 385 Pa. 394, 397, 123 A.2d 413, 415 (1956)).

With these precepts in mind, the Court now turns to the relevant provisions of the Policy to determine whether coverage actually exists for the Columbia and Vinsick Losses.

### 2.     The Policy Exclusions Raised by Century Are Ambiguous

The Insuring Agreement in the Policy provides that Century agrees to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  The Insuring Agreement further provides that this "insurance applies to . . . 'property damage' only if . . . the 'property damage' is caused by an 'occurrence' that . . . occurs during the policy period . . .."  (Ex. F to Jt. Stip. (*Commercial General Liability Coverage Form* at 1).)  Century is not basing its denial of coverage on the language in the Insuring Agreement, but rather, is denying coverage based on two exclusions under the Policy.  In so doing, Century appears to no longer be disputing that the Columbia and Vinsick Losses constitute "property damage" and that such "property damage" was caused by an "occurrence."  Thus, the only question facing the Court is whether any of the asserted Policy exclusions actually apply to preclude coverage.

In support of its contention that it is not obligated to indemnify its insured, Century asserts that two exclusions under the Policy apply to bar coverage: (1) the impaired property exclusion and (2) the sistership exclusion (sometimes referred to as the "product recall" exclusion).[6]  The impaired property exception, which falls under the category of "business risk" exclusions[7], is intended to

---

[6]At oral argument on the cross motions for summary judgment held on November 16, 2005, counsel for Century represented to the Court that although it relied on both exclusions in denying coverage, Defendant was hanging its hat on the impaired property exclusion in the pending motion.  (Tr. of Oral Arg. at 12.)

[7]Exclusions for injury to the work or products of the insured are generally denominated as "business risk" exclusions.  Lynette Norton, *Insurance Coverage in Pennsylvania,* § 16.B(10) at 226 (PBI 1997).

"exclude coverage when the cause of the loss is within the insured's control, such as the quality and conformity of the product." 4 Kevin J. Walsh & Robert I. Steiner, *Law and Prac. of Ins. Coverage Litig.* § 46.14.  Insurers often raise these exclusions where the damage should have been covered by other insurance, such as a performance bond or warranty program, or where the resulting damage sounds in breach of contract as opposed to tort/accidental harm, in order to prevent the general liability insurer from becoming a guarantor of the insured's product or work.  Lynette Norton, *Insurance Coverage in Pennsylvania,* § 16.B(10) at 226 (PBI 1997).  However, such exclusions generally do not preclude coverage where the insured's work or product causes damage to a third party's person or property.  *Id.  See also,* Michael J. Brady, *The Impaired Property Exclusion: Finding a Path Through the Morass,* 63 Def. Couns. J. 380-81 (1996) ("General liability insurance coverage is designed to cover tort liability arising from unforeseen and accidental losses to others and not for contractual liability of the insured for economic loss because the product or work is not that for which the damage person bargained.  Such tort liability is largely outside the insured's control, such as when the insured's product injures a consumer.  The impaired property exclusion upholds this theory.")

As to the sistership exclusion, the Court of Appeals has succinctly stated its purpose:

> When a product is withdrawn because of defective performance, a "sistership" provision excludes coverage for costs incurred when a related, "sister" product is also withdrawn because its relationship to the defective product renders its quality suspect.  Sistership provisions are not intended to exclude from coverage damages arising from the withdrawal of the product that raised suspicions.  *A fortiori,* they do not exclude coverage of damages arising from a defective product when no sister products are involved.

*Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.,* 858 F.2d 128, 136 n. 9 (3d Cir. 1988)

17

(citing *Todd Shipyards Corp. v. Turbine Serv., Inc.,* 674 F.2d 401, 419 (5th Cir. 1982); *Arcos Corp. v. Am. Mut. Liab. Ins. Co.,* 350 F.Supp. 380, 384-85 (E.D. Pa. 1972), *aff'd* 485 F.2d 678 (3d Cir. 1973)).   Stated another way, the intent of this exclusion is to "exclude from coverage the cost of preventative or curative action by withdrawal of a product in which a danger is to be apprehended because of a common defect in a sister product."  9 *Couch on Insurance* § 130:12 (citing *Gulf Mississippi Marine Corp. v. George Engine Co.,* 697 F.2d 668, 674 (5th Cir. 1983) (exclusion found not to apply to damages arising from malfunctioning product where no sister products were involved)).

At the outset, the Court notes that the Pennsylvania Supreme Court has not addressed the precise issues presented in the instant case.  Where, as here, the state's highest court has not issued a definitive ruling on a particular issue of law, the federal court must predict how that state court would rule if faced with the issue.  *Covington,* 381 F.3d at 218 (citing *Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1046 (3d Cir.1993)).  In *Covington,* the Court of Appeals further explained:

> "In carrying out that task, [the federal court] must consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  The decision of an intermediate state court is particularly relevant and "is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

*Id.* (quoting *Packard,* 994 F.2d at 1046; *C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465, (1967)). Moreover, after exhaustive research, neither the parties nor the Court was able to locate any case law from any other jurisdiction directly on point.

18

Washington Energy argues that at the very least, the Policy exclusions raised by Century are ambiguous and therefore should be construed in its favor to require coverage. With regard to the impaired property exclusion, Washington Energy cites numerous treatises and/or periodicals wherein the commentators have described the exclusion as ambiguous, "confusing," "complex," "difficult to apply," "tricky," and/or "complicated". *See e.g.,* Brady, *supra,* at 382; Scott C. Turner, *Insurance Coverage of Construction Disputes* § 26.4 (2d ed. 2004); Donald S. Malecki & Arthur L. Flitner, *Commercial General Liability* 62 (7th ed. 2001); 4 *Bruner & O'Connor on Construction* § 11:49, at 170-71; Patrick J. Mielinski, et al., *Contractual Risk Transfer* XVII.S.13 (2002); Patrick J. O'Connor, Jr., *Commercial General Liability Coverage*, 19-APR CONSTRUCTION LAW 5 (April 1999).[8] In addition, Washington Energy cites cases from other jurisdictions which have found the impaired property exclusion to be ambiguous.[9]

As to the sistership exclusion, Washington Energy contends that numerous courts and commentators have likewise found this exclusion to be ambiguous and the courts have refused to apply it. *See, e.g., Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178, 1211 (2d Cir. 1994); *City of Plaquemine v. North Am. Constructors, Inc.,* 683 So. 2d 386, 389 (La. Ct. App. 1996); *U.S. Fire Ins. Co. v. Good Humor Corp.,* 496 N.W.2d 730, 737-38 (Wis. Ct. App. 1993); 9 *Couch on Insurance* § 130:12 (3d ed. June 2005); Jean E. Maess, Annotation, *Validity and Construction of "Sistership" Clause,* 32 A.L.R.4th 630 (2004).

On the other hand, Century contends that the Policy exclusions are not ambiguous and relies

---

[8] Washington Energy also cites a number of other authorities in its Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Further Support of its Motion for Summary Judgment at 23-25 & n. 28, for the same proposition.

[9] *See, e.g.,* the cases cited in Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and in Further Support of Plaintiff's Motion for Summary Judgment at 22 & 23 n. 27.

primarily on the Pennsylvania Superior Court's decision in *Solcar Equip. Leasing Corp. v. Pa. Mfrs'*

*Ass'n Ins. Co.,* 414 Pa.Super. 110, 606 A.2d 522 (1992), and the federal district court's decision in

*Puritan Ins. Co. v. Aldan Rubber Co.,* Civ. A. No. 86-2937, 1988 WL 9880 (E.D. Pa. Feb. 9, 1988),

*aff'd* 866 F.2d 648 (3d Cir. 1989).   Century also cites several other cases, mostly from other

jurisdictions, in support of its position that the impaired property exclusion is not ambiguous as

applied here.[10]

The Court finds that Century's reliance on *Solcar* and *Puritan* is misplaced.   In *Solcar,* the

Pennsylvania Superior Court held that impaired property and sistership exclusions, which were

similar in some respects to those at issue here, were clear and unambiguous.    In that case, the

insured was a subcontractor hired to pour concrete for the construction of new homes.   After

construction was complete, problems developed and several homeowners sued the general

contractors for negligence and breach of contract.   Subsequently, the contractors sought

indemnification from the insured/subcontractor for its faulty work.   The Superior Court found that

the loss in value of the homeowners' properties due to the subcontractor's negligence did not

constitute an accident or occurrence under the insurance policy. 414 Pa.Super. at 120, 606 A.2d at

527.   The Superior Court went on to hold that coverage was also precluded by several exclusions,

two of which appear to be somewhat similar to the impaired property and sistership exclusions at

issue here.[11]   In determining whether the exclusions applied in *Solcar*, the Superior Court found

---

[10]*See, e.g., St. Paul Fire & Marine Ins. Co. v. The Bergquist Co.,* 28 Pa. D&C 4th 141 (Pa. Com. Pl. Feb. 8, 1996), and the cases cited in Century's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment at 9.

[11]The impaired property and sistership exclusions in *Solcar* respectively provide:
   8.  loss of use of tangible property which has not been physically injured or
   destroyed resulting from
   (a) a delay in or lack of performance by or on behalf of the named insured of any

preliminarily that the exclusions were "clear and free of ambiguity."  *Id.* at 123, 606 A.2d 528.

The Pennsylvania Supreme Court has opined that when determining whether the language in an insurance policy is ambiguous, such determination is not done in a vacuum, but rather, must be made in light of the particular facts of the case.  *Lititz Mut. Ins. Co. v Steely*, 567 Pa. 98, 104, 785 A.2d 975, 978 (2001) (citing *Madison Constr.,* 557 Pa. at 606, 735 A.2d at 106).   A close examination of the facts and policy language at issue in *Solcar* reveals several dissimilarities between that case and the case at bar, which are material to the Superior Court's holding in *Solcar*. First, in *Solcar*, the Superior Court found that the damage was not caused by an occurrence, while in this case, Century has conceded that the property damage resulted from an occurrence under the Policy.  Second, the comparable so-called "impaired property" exclusion at issue in *Solcar* omits the very language on which Century hangs its hat in invoking the exclusion in this case.  Specifically, the exclusion in *Solcar* omits the term "impaired property," as well as the clause excluding from coverage property damage "arising out of a defect, deficiency, inadequacy or dangerous condition" in the insured's product or work.  *Id.* at 122, 606 A.2d at 528.  Indeed, the Superior Court in *Solcar* focused on that part of the exclusion that excluded from coverage damages for breach of contract or

_____

contract or agreement, or
(b) the *failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance quality, fitness or durability warranted or represented by the named insured;*
but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;
9.  *damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured* or of any property of which such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

414 Pa.Super. at 122-23, 606 A.2d at 528 (emphasis in original).

21

warranty.  Unlike the property damage in *Solcar,* there is no indication in the record before this Court that the Columbia and Vinsick Losses were based on breach of contract or warranty claims.[12]  Quite to the contrary, it appears that the amounts Washington Energy paid to Columbia and Vinsick were for consequential damages[13] resulting from an occurrence as defined under the Policy.   Finally, the Superior Court was not asked to decide whether the exception to the exclusion applied and therefore it did not determine whether that language was ambiguous.[14]   As to the language of the sistership exclusion in *Solcar,* the Superior Court again clearly focused on the failure of the work performed by the insured to meet the level of performance quality represented by the insured, nor was it asked to construe the term "product."  414 Pa.Super. at 123, 606 A.2d at 528.

Century's reliance on *Puritan* is likewise misplaced.  In that case, the district court found no duty to defend or indemnify under the following language of the impaired property exclusion:

> This insurance does not apply . . . to loss of use of tangible property
> which has not been physically injured or destroyed resulting from
> . . . the failure of the named insured's products or work performed by
> or on behalf of the named insured to meet the level of performance,

---

[12]At oral argument, Century conceded that there was no evidence in the record to support its contention that the claims filed by Columbia and Vinsick were for breach of contract and/or warranty.  (Tr. of Oral Arg. at 21.)

[13]The consequential damages are those damages that are causally related to Columbia's loss of use of its transmission lines and include labor and related costs in purging the transmission lines and restoring natural gas service to its customers (including relighting pilot lights for its customers after the purging and restoration).  Vinsick's consequential damages include loss of use of its business during the time it was without natural gas service from Columbia.  Century takes issue with whether consequential damages which are essentially "economic" losses, may be recovered under the Policy.  The Court of Appeals in *Imperial Casualty* held that loss of use damages includes economic damages that occur as a result of the loss of use.  858 F.2d at 135-36;  *see also Mattiola Constr. Corp. v. Commercial Union Ins. Co.,* 60 Pa. D&C 4th 412, 2002 WL 434296, *3-4 (Pa. Com. Pl. Mar. 8, 2002) and authorities cited therein ("a party's description of loss of use damages as merely economic does not take them outside the coverage of an insurance policy that defines property damage as including loss of use").  Under *Imperial* and *Mattiola*, it is clear that the consequential damages sought by Columbia and Vinsick constitute loss of use damages under the Policy.

[14]Conspicuously absent from the exception to the exclusion in *Solcar* was the term "intended" before the word "use" in the clause "put to its use."  The term "intended" is a source of ambiguity in the Century Policy.

quality, fitness, or durability warranted or represented by the named
insured;

1988 WL 9880, at *1.  The court found that the gravamen of the above language was to exclude

coverage for breach of warranty claims under the Uniform Commercial Code.  *Id.* at *2 (citation

omitted).  Because the underlying complaint included counts of breach of express warranty and

breach of implied warranty, the court held the claims fell within this exclusion.  *Id.*  The instant case

differs from *Puritan* in two major respects.  First, Century does not rely on the breach of warranty

language in the impaired property exclusion in its denial of coverage.  Second, there is no underlying

complaint or any other evidence in the record that shows the claims submitted by Columbia and

Vinsick constitute claims for breach of express or implied warranties.  Therefore, the district court

in *Puritan* was not asked to apply the exclusionary language at issue here and opine as to its

ambiguity.  Even if it had, the facts here are so different that the district court's finding in *Puritan*

would not be dispositive of the issue in this case.  Thus, *Puritan* is completely inapposite to the case

at bar.

Given the unique facts of this case and the different Policy language at issue, the holdings

in *Solcar* and *Puritan* are distinguishable, and therefore, this Court is not constrained to find that the

exclusionary language of Century's policy is clear and free of ambiguity.  2 *Couch on Insurance*

§ 21:11 (3d ed. 2004).  Thus, the Court begins its analysis here with a clean slate.

The Court has encountered great difficulty in attempting to give effect to the language of the

impaired property exclusion in light of the unique facts in this case.  The first unique aspect is the

insured's product–natural gas.  Although considered tangible property, natural gas, because of its

unique characteristics, cannot be compared to the typical manufactured product to which the

impaired property exclusion is mostly applied.  Indeed, trying to apply the impaired property exclusion to a natural gas supplier is like trying to fit the proverbial square peg in a round hole.  As can be seen by the briefs in this case, the parties disagree over some of the basic terms of the exclusion, *e.g.,* what is the insured's product–the natural gas, the air that entered its transmission lines and formed pockets, or the transmission lines/equipment–and whether the insured's product was defective or dangerous.  Also, the Court finds elusive answers to these basic questions: (1) Can natural gas, which is not "manufactured" in the typical sense by the insured, be considered defective or dangerous, when it arrives at the customer's lines in the same state or condition as when it left the insured's premises; (2) is natural gas capable of being "incorporated" into a customer's transmission lines, where gas is not changed in any way from the time it left the insured/supplier; and (3) depending on the answers to parts (1) and (2) above, when is the insured's product or work put to its intended use, for purposes of applying the exception to the impaired property exclusion?

Because there is no legal precedent for answering these questions, and they are reasonably susceptible to more than one answer, the Court concludes the language of the impaired property exclusion, as applied to the facts of this case, is ambiguous and therefore, must be construed in favor of the insured, Washington Energy.

Likewise, the sistership exclusion is far from a model of clarity.  Washington Energy submits that Century cannot credibly argue that the Columbia Loss unambiguously seeks damages for a "recall" or "withdrawal" of a "product" "from the market or from use" as required by the exclusion. The fact that the courts cannot agree as to when the sistership exclusion should be applied to bar coverage is indicative of its ambiguous nature.  The majority view, to which the Third Circuit Court of Appeals subscribes, holds that the sistership exclusion does not apply to damages incurred for

withdrawal from use of the defective product. *Imperial Cas. & Indem. Co.,* 858 F.2d at 136 n. 9;

*Keystone Filler & Mfg. Co., Inc. v. Am. Mining Ins. Co.,* 179 F.Supp.2d 432, 439 (M.D.Pa. 2002)

(citing *Imperial Cas., supra*); *Arcos Corp. v. Am. Mut. Liab. Ins. Co.,* 350 F.Supp. 380, 385 (E.D.Pa.

1972); *see also* 9 *Couch on Insurance* § 130:12 (3d ed. 2004). Significantly, this view is consistent

with the intent behind the exclusion, to wit, to exclude from coverage the costs incurred for

withdrawing sister products discovered to have a common fault because such withdrawal involves

expenses incurred to *prevent accidents which have not yet occurred. The Bergquist Co.,* 28 Pa. D&C

4th at 154 (citing *Ohio Cas. Ins. Co. v. Terrace Enter. Inc.,* 260 N.W.2d 450, 455 (Minn. 1977))

(emphasis added). CGL policies are not designed to pay the costs of preventing occurrences, but

rather, are designed to cover accidents which have already occurred. *Id.* Therefore, the majority

view is consistent with the intent behind CGL policies.

On the other hand, the minority view upon which Century relies holds that the sistership

exclusion "applies across the board to exclude damages arising out of the item in which the defect

first appears, as well as its sister products."[15] 9 *Couch on Insurance* § 130:12 (citation omitted ).

As one commentator has noted, this judicial disagreement appears to be predicated on a focus on the

term "product" in the exclusion. If construed broadly, "product" could be deemed to exclude even

products that have been specifically identified as defective. However, a more narrow construction

views the terms "products" as a "generic description referring to a general recall of products not yet

found to be defective, in order to prevent injury from that portion of the products which might be

---

[15]Apparently, the minority view was subscribed to by Judge O'Neill in the Eastern District of Pennsylvania in *West American Ins. Co. v. Lindepuu,* 128 F.Supp.2d 220, (E.D.Pa. 2000), and relied on by Century in support of its denial of coverage. As explained in part 3.b. below, the Court finds the decision in *Lindepuu* is at odds with the holding of the Court of Appeals in *Imperial Cas. & Indem. Co.* Accordingly, *Lindepuu* is not controlling on this issue.

defective."[16]  *Id.*

Because the application of the sistership exclusion turns on the construction of the term "product," and it appears that term is reasonably susceptible of more than one meaning, as written and as applied to the facts here, the Court concludes that the sistership exclusion is ambiguous. Accordingly, the exclusion must be construed in favor of the insured, Washington Energy.

### 3.      In Any Event, The Policy Exclusions Relied On By Century Do Not Apply

Notwithstanding the Court's finding that the Policy exclusions are ambiguous, the exclusions asserted by Century do not apply in any event under the facts of this case.

In relying on the impaired property and sistership exclusions, Century submits that Washington Energy's product, the natural gas, was defective and/or dangerous because air infiltrated the gas, thereby becoming a part of the gas and contaminating it.  As a result, Century argues, the gas became combustible and therefore, dangerous.  Century further posits that this defective and/or dangerous natural gas was incorporated into the transmission lines of Columbia and its customers. Accordingly, Century submits that the impaired property exclusion applies to bar coverage because Columbia's transmission line constitutes "impaired property" under the Policy.  Alternatively, Century contends the impaired property exclusion still applies because there was no physical injury to property belonging to Columbia or Vinsick.[17]   In addition, Century argues that the sistership

---

[16]The more narrow construction appears to be the better approach, given Pennsylvania law on interpreting contracts, the general purpose of the exclusion, and the fact that replacement of defective items of a product are generally covered in a commercial general liability insurance policy.  9 *Couch on Insurance* § 130:12.

[17]Century also argues that the exclusion applies to bar coverage because Washington Energy had control over the cause of the loss since the failure of the nipple occurred on its property and Washington Energy could have installed an oxygen sensor system that could have detected any air infiltration of its natural gas.  Not surprisingly, Washington Energy counters that the cause of the Columbia and Vinsick Losses was the sudden and accidental failure of the nipple, a risk that was not within its control.  The Court finds no merit to Century's argument.  First,

exclusion applies to bar coverage because the Columbia Loss consists of expenses incurred for withdrawal, replacement, removal and/or disposal of Washington Energy's natural gas because it was defective and/or dangerous.

As a threshold matter, in order for both the impaired property and sistership exclusions to apply, the insured's product must be defective or dangerous.[18]  However, the record in this case does not show that Washington Energy's natural gas was either defective or dangerous.  What is clear from the record is that the sudden rupture of the nipple caused air to infiltrate the *transmission lines* of Washington Energy and eventually the *transmission lines* of Columbia and its customers, resulting in a potentially dangerous condition *in their transmission lines*.  There is no evidence that the air infiltrated the natural gas, thereby becoming part of the gas and contaminating it and making the natural gas defective or dangerous.  As pointed out by counsel for Washington Energy at oral argument, the parties stipulated that there were air pockets. Counsel argued that the air did not mix with the gas and therefore the gas was not defective. (Tr. of Oral Arg. at 29.) Because Century has denied coverage based on an exclusion, it had the burden to come forward with evidence to show that the air infiltrated the natural gas, thereby becoming part of it and contaminating the insured's product.  All that Century has provided is its conclusory allegation, nothing more.  Since Century has failed to show that Washington Energy's natural gas was defective and/or dangerous, it cannot

---

Century has conceded that the property damage resulted from an occurrence, which is defined under the Policy as an accident.  Second, Century has not pointed to any evidence in the record showing that Washington Energy was required to install an oxygen sensor prior to the occurrence.  More importantly, since Century has failed to show that Washington Energy's product was defective or dangerous (for the reasons explained below), it cannot meet its burden of establishing that the impaired property exclusion applies here.

[18]These exclusions also apply to a defect, deficiency, inadequacy or dangerous condition in the insured's "work."  Century does not appear to be contending that the insured's work was defective or dangerous.  Accordingly, the Court has applied the exclusions looking only to the insured's "product."

rely on either the impaired property or the sistership exclusion to deny coverage.

Even if Century had been able to establish that Washington Energy's natural gas was somehow defective and/or dangerous, additional reasons exists for finding that these exclusions do not apply to bar coverage.

### a. Impaired Property Exclusion

Although Century maintains that Columbia's transmission lines constitute impaired property, it completely overlooks one important requirement:  In order to satisfy the definition of impaired property, Century must show that Columbia's transmission lines "incorporated" Washington Energy's defective and/or dangerous natural gas.  The Policy does not define the term, "incorporate," and thus the Court turns to the dictionary meaning of the word, which provides: "to combine or join with something already formed; make part of another thing; . . . to bring together into a singe whole; merge." *Webster's New World Dictionary* (2d College ed.).  In addition, a noted commentator made the following observation regarding the term, "incorporates":

> "Incorporates" is a rather vague term.  What degree of integration is required for the impaired property to be found to "incorporate" the work or product?  In this context, it is advantageous for the insured to obtain a narrow reading of "incorporates."   Thus, pursuant to the doctrine of contra proferentem, any ambiguity must be construed toward as narrow an interpretation and application of this term as is reasonable.  Given the this criteria, anything short of a complete blending of "your product" or "your work" with the other property in question would arguably fall short of satisfying the "incorporates" requirement.

Turner, *supra,* § 26:11.

In light of the above meanings ascribed to the term, "incorporate," it strains credibility to suggest that Washington Energy's natural gas was somehow incorporated into Columbia's

transmission lines.  As the Court views it, the transmission lines are merely a conduit for the natural gas; there was no effort undertaken to combine or "blend" the two to make a single product.  Century has not proffered any explanation or authority to the contrary.  Accordingly, the Court finds that Century has failed to show that Columbia's transmission lines constitute impaired property.

Taking the application of the exclusion one step further, if, for argument's sake, Century had proven that there was no physical injury to Columbia's and Vinsick's property, and that the property damage arose out of a defect or dangerous condition in Washington Energy's natural gas, then the impaired property exclusion would apply to bar coverage, unless the exception to the exclusion applied. The exception states: "This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" . . . after it has been put to its intended use."   Washington Energy argues that in the event the Court finds that Century has shown that all of the requirements of the impaired property exclusion have been met, the exception to the impaired property exclusion applies because the failure of the nipple caused "sudden and accidental physical injury to Washington Energy's natural gas, causing loss of use to the transmission lines of Columbia and its customers (other property), after the natural gas had been put to its intended use.[19] In the alternative, Washington Energy argues that whether the physical injury to its product occurred after it had been put to its intended use is ambiguous and therefore should be construed in its favor.

Disagreeing with Washington Energy as to the application of the exception, Century submits

---

[19]In support of this argument, Washington Energy relies on *Nitterhouse Concrete Products v. Pa. Mft'rs Ass'n Ins. Co.,* 67 Pa. D&C 4th 225 (Pa. Com. Pl. 2004).  In that duty to defend case, the court was asked to determine whether the insurer had a duty to defend the underlying case wherein it was alleged that a physical injury occurred to the insured's completed work, *i.e.,* renovations to a school building.  In determining that the exception to the impaired property exclusion applied, the court relied on the "physical injury" element alone, without addressing either the "sudden and accidental" or the "after it was put to its intended use" element.  Therefore, *Nitterhouse* is not dispositive of the "intended use" element in question here.

that in addition to the "sudden and accidental" requirement, Washington Energy was required and failed to show physical injury to its natural gas, and that the loss of use occurred after the natural gas had been put to its intended use.   Century does not present any argument as to why Washington Energy has failed to show that the physical injury to Washington Energy's natural gas was sudden and accidental.   Rather than attack this element of the exception, Century instead focuses on the other two requirements: (1) "physical injury" to Washington Energy's natural gas (2) after it was "put to its intended use."

With regard to the physical injury requirement, Century contends that although air infiltrated the natural gas, rendering it defective and/or dangerous, it was not physically injured.   Century's argument defies logic.   If the natural gas was defective and/or dangerous, as Century argues it was, it could only have ended up in that condition as a result of the air infiltrating the natural gas.   That being the case, the Court must also conclude that a type of "physical injury" occurred to the natural gas when the air infiltrated the transmission lines.   *See* Scott C. Turner, *Insurance Coverage of Construction Disputes* § 26.18 (June 2005) ("The physical presence of a defective component incorporated into the whole product can satisfy the physical injury requirement.")   It seems logical, therefore, that Washington Energy's product can only be defective and/or dangerous if it was physically altered, *i.e., injured,* in some way from the air infiltration.   Thus, as the Court views it, the physical injury requirement would be met if Century had successfully proved that the natural gas was defective and/or dangerous.

Century's only remaining argument is that the Columbia and Vinsick Losses occurred before the natural gas had been put to its intended use.   However, the parties do not agree as to the meaning

30

of the phrase, "put to its intended use,"[20] and none of the cases cited by either party are directly on

point.[21]  With regard to this element of the exception, one commentator has noted:

> The phrase "after it has been put to its intended use" is likewise
> uncertain.  Is the application of this term limited to "use" by someone
> else after completion and/or occupation? Or, does it simply mean any
> time work on the particular part of "your product" or "your work" has
> progressed to the point that it is performing its "use," at least to some
> extent, before it is suddenly and accidentally physically injured. . . .
> The insured should be favored by a broad reading of "after it has been
> put to its intended use."  Therefore, the broadest and most expansive
> construction of that term as is reasonable should be applied.

Turner, *supra*, § 26:26.

In the absence of any case law or other authority directly on point, the Court notes that the

business of supplying and/or transporting natural gas is vastly different from the manufacturing

business–natural gas is transported through the transmission lines continuously, while in a

manufacturing setting, it is fairly easy to determine when the manufactured product leaves the

---

[20]Washington Energy submits that if "intended use" means "end use," then the physical injury occurred
after Columbia supplied Washington Energy's natural gas to its customers, in that the "air pockets caused customers'
pilot lights to expire, followed by dangerous gas build ups and the threat of explosion upon relighting–thus
necessitating the loss of use of the transmission lines."  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. &
in Further Support of Pl.'s Mot. for Summ. J. at 21.)  On the other hand, Century argues that the natural gas was not
put to its intended use until it reached Columbia's transmission lines.  Since the air infiltrated the natural gas in
Washington Energy's factility before it reached Columbia's lines, Century argues that the losses resulting therefrom
occurred before the natural gas had been put to its intended use, *i.e.,* when the gas reached Columbia's transmission
lines.  The Court notes another possible construction–that the natural gas was put to its intended use when it left its
production plant, and therefore, the loss of use of the transmission lines of Columbia and its customers occurred after
the natural gas had been put to its intended use.  The different possible constructions of the phrase "after it has been
put to its intended use" underscores its ambiguous nature.

[21]In support of its interpretation of when the natural gas was put to its intended, Century cites *St. Paul Fire
& Marine Ins. Co. v. Futura Coatings,* 993 F.Supp. 1258 (D. Minn. 1998), and *Puritan Ins. Co., supra*.  However,
neither of these cases is dispositive of the "intended use" requirement in the exception.  In *Futura,* the underlying
claims alleged misrepresentation about the insured's products and a failure of the insured's products to perform as
promised.  The district court's determination of "intended use" was made with regard to its interpretation of the term
"completed work" in applying the impaired property *exclusion* not the *exception to the exclusion.* Moreover, whether
"completed work" is put to its intended use is hardly comparable to when the allegedly defective natural gas was put
to its intended use.  *Puritan* is inapposite for the reasons set forth above.

manufacturing facility and when it is incorporated into another product.[22]  Accordingly, in light of the unique facts here, the Court finds the phrase "put to its intended use" as written in Century's Policy is reasonably susceptible of more than one meaning and, therefore, is ambiguous.

Thus, even if the Court were to find the impaired property exclusion was not ambiguous, Century has failed to meet its burden of establishing all of the requirements of the exclusion and, in any event, the exception to the exclusion is ambiguous.  Therefore, the exception must be construed in favor of Washington Energy to find coverage.

b.    *Sistership Exclusion*

Similarly, assuming for argument's sake that Century has shown that Washington Energy's product was somehow defective and/or dangerous, Century cannot meet its burden of showing that the sistership exclusion applies under the facts of this case.  Unlike the typical withdrawal from use or the market where the defective product is changed in some way to remove or eliminate the defect, nothing was done to Washington Energy's natural gas after it was "withdrawn" from the transmission lines.  The natural gas was exactly the same both before and after its transmission was stopped in order to purge the transmission lines of Washington Energy, Columbia and its customers, including Vinsick.  Thus, the damages claimed by Columbia and Vinsick are not related to the recall or withdrawal from use of the natural gas, but rather, from the loss of use of its transmission lines. For this reason alone, the Court finds the sistership exclusion is not applicable to bar coverage in this case.

---

[22]Perhaps the reason it is difficult to ascertain when the natural gas was put to its intended use is because in the typical situation, the defect or dangerous condition in the product usually surfaces at a point in time that can be clearly established after it has left the manufacturing site.  In the case at bar, a defect or dangerous condition never surfaced in the natural gas; rather, the defect or dangerous condition, if any, occurred in the transmission lines when air infiltrated the lines.

Moreover, as stated above, legal precedent in this Circuit makes clear that the sistership exclusion does not apply where there are no sister products withdrawn from use.  *Imperial Cas. & Indem. Co.,* 858 F.2d at 136 n. 9; *Keystone Filler & Mfg. Co.,* 179 F.Supp.2d at 439; *Arcos Corp.,* 350 F.Supp. at 385  (citing 2 Long, *The Law of Liability Insurance*, Appendix B, § 15, p. 47); *Lang Tendons, Inc. v. N. Ins. Co. of New York,* No. Civ. A. 00-2030, 2001 WL 228920, *10 (E.D.Pa. Mar. 7, 2001) (citing *Arcos, supra; Imperial Cas., supra).*  This position has also been adopted by the Court of Appeals for the Fifth Circuit in *Gulf Mississippi Marine Corp., supra,* and by a leading commentator, 9 *Couch on Insurance* § 130:12 (3d ed. 2004). The interpretation adopted by both the Third and Fifth Circuits is consistent with the intended purpose behind the sistership exclusion, as noted above.  In the instant matter, assuming for argument's sake that Washington Energy's natural gas was "withdrawn" from use due to a suspected defect or dangerous condition, the sistership exclusion does not apply because there were no sister products withdrawn from use.

In arguing to the contrary that the sistership exclusion applies to the defective product that caused the injury, Century relies on another district court decision from the Eastern District of Pennsylvania, *West Am. Ins. Co. v. Lindepuu,* 128 F.Supp.2d 220 (E.D.Pa. 2000).  However, the Court finds that such reliance is misplaced.  Although the district court in *Lindepuu* discussed *Imperial Casualty* for its application of a different exclusion not relied on by Century in denying coverage, when discussing the application of the sistership exclusion, the *Lindepuu* court neglected to mention, let alone consider, the Court of Appeals' finding in *Imperial Casualty* that the sistership exclusion applies only when sister products are involved.  Likewise, the Court in *Lindepuu* failed to mention the district court's decision in *Arcos,* which also required the involvement of sister products for the exclusion to apply.

33

In addition, *Lindepuu* is factually distinguishable from this case.  There the insured was a subcontractor who was contracted to install windows and doors (supplied by another party) into new homes under construction.  The subcontractor was accused of negligently installing the windows and doors and subsequently,  the homeowners submitted claims against the subcontractor for damage to the windows and doors and for the cost of replacing them.  The court found that the sistership exclusion applied because the subcontractor's allegedly negligent installation constituted his "work," as well as "impaired property" (*i.e.,* the doors and windows were property other than the insured's that could not be used or were less usable because they incorporated work that was thought to be defective, deficient, or inadequate), that was withdrawn from use and had to be replaced or repaired because of a known or suspected defect, deficiency or inadequacy.  128 F.Supp.2d at 229.  The *Lindepuu* court further found that the damage claims against the subcontractor were restricted to the replacement and repairs of the windows and doors and did not include any consequential damages. *Id.* at 231.  Since the claims against the subcontractor fell within the policy exclusion, the insurer had no duty to defend.  *Id.*  In the case at bar, there is no impaired property in the first instance, and secondly, Washington Energy's product was neither replaced nor repaired because of a known or suspected defect or dangerous condition.  Moreover, the Columbia and Vinsick Losses constitute consequential damages which are not barred by the exclusion.

Therefore, for the reasons set forth above, the Court finds the sistership exclusion does not apply to bar coverage for the Columbia and Vinsick Losses.

### 4.    Exclusion for Failure to Supply Is Indicative of Intended Coverage Under the Policy

Although not a basis for denying coverage, the Failure to Supply Exclusion is significant as

it addresses specifically the type of business in which Washington Energy is engaged and provides some indication as to the intended coverage for Washington Energy's business, as opposed to the generic language in the main body of the Policy which applies to all insureds without regard to their particular line of business.  When interpreting an insurance contract, the Court must look at the entire document, and the specific terms in an endorsement generally control over less specific provisions in the body of the policy, unless the terms of the endorsement are hidden or unfairly restrict coverage provided in the main policy.  Barbara O'Donnell, 1 *Law and Practice of Insurance Coverage Litigation* § 1:9 (Sept. 2005); *see also St. Paul Fire & Marine Ins. Co. v. United States Fire Ins. Co.,* 655 F.2d 521, 524 (3d Cir. 1981) (citations omitted) (applying Pennsylvania law, court of appeals noted that "[i]f there is a conflict between the terms of the endorsement and those in the body of the main policy, then the endorsement prevails, particularly when it favors the insured.") Moreover, the Court of Appeals has observed:

> These rules have developed as a result of the common industry practice of using a basic policy form and then attaching endorsements to provide specialized forms of coverage.  To the extent that the standard conditions in the underlying form are applicable, this procedure avoids unnecessary repetition.  But when a specific form of insurance is provided by an endorsement tailored to meet the particular needs of the insured and the company, that language must be followed to carry out the intentions of the parties.

*United States Fire Ins. Co.,* 655 F.2d at 524.  Reading the endorsement containing the Failure to Supply exclusion together with the main body of the Policy, the Court does not find that they are in conflict.  However, the specific terms of the endorsement do provide some guidance as to the intended coverage vis a vis Washington Energy's business.

From the language of the Failure to Supply exclusion, it appears that it is meant to apply in

a breach of contract or warranty situation, which is consistent with the exclusions contained in the main body of the CGL Policy. The Failure to Supply exclusion is not applicable here because there is no evidence in the record that the damages claimed by Columbia and Vinsick are based on a failure by Washington Energy to adequately supply gas to Columbia, or that Washington Energy breached a contract or warranty with Columbia. Rather, the evidence shows that these Losses consist of consequential damages incurred as a result of the loss of use of Columbia's transmission lines and those of its customers. Perhaps even more important is Century's abandonment of this exclusion as a basis for denying coverage. By so doing, Century cannot credibly argue that the claims brought by Columbia and Vinsick are based on breach of contract or warranty.

Also significant about the Failure to Supply exclusion is the exception to this exclusion. Although the exception never comes into play here because Century abandoned its reliance on the Failure to Supply exclusion to deny coverage, the exception does inform the Court as to Century's intended coverage under the Policy with specific regard to Washington Energy's business of supplying natural gas. In essence, the exception provides that coverage exists under the Policy when the failure to supply results from sudden and accidental injury to tangible property owned or used by the insured to process or transmit natural gas. Arguably it appears that if the Failure to Supply exclusion applied in this case, coverage would not be precluded because the interruption in the gas supply to Columbia and its customers resulted from sudden[23] and accidental injury[24] to Washington

[23]The undisputed facts show that the *injury* to the nipple was sudden–Century's expert opined that the nipple rupture occurred rapidly. (Jt. Stip. ¶ 33 (quoting Ex. H at 2).) The exception is triggered when there is an sudden *injury* to the insured's tangible property owned or used to process and transmit the natural gas. The injury here was the sudden rupture to the nipple. Therefore, the root cause of the initial crack which resulting in the rupture, *i.e.*, either corrosion or a manufacturing defect in the nipple, is irrelevant as far as application of the exception goes.

[24]Century concedes that the injury was accidental by virtue of its acceptance of the existence of an occurrence under the Policy, which is, by definition, an "accident."

Energy's transmission equipment.   Thus, the language in the exception to the Failure to Supply exclusion evidences an intent to provide coverage when a sudden and accidental mechanical failure occurs in the insured's transmission equipment and reinforces the Court's conclusion that coverage actually exists under the Policy for the Columbia and Vinsick Losses.

## III.   <u>CONCLUSION</u>

For all of the above reasons, the Court finds that coverage exists under the Policy for the Columbia and Vinsick Losses.  Therefore, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be granted, Defendant's Motion for Summary Judgment be denied, and that judgment be entered in favor of Plaintiff.

In accordance with the Magistrates Act, 28 U.S.C.   § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: December 2, 2005                          BY THE COURT:


                                                      /s/ Lisa Pupo Lenihan
                                                 LISA PUPO LENIHAN
                                                 U.S. Magistrate Judge


cc:      Honorable Donetta W. Ambrose
         United States District Judge

Neal R. Brendel
Roberta Anderson
Kirkpatrick & Lockhart Nicholson Graham
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA 15222-2312

Dennis St. John Mulvihill
Daniel L. Rivetti
Robb Leonard Mulvihill
2300 One Mellon Center
Pittsburgh, PA 15219